**SECOND DIVISION**
**MILLER, P. J.,**
**MERCIER and PIPKIN, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

*DEADLINES ARE NO LONGER TOLLED IN THIS COURT. ALL FILINGS MUST BE SUBMITTED WITHIN THE TIMES SET BY OUR COURT RULES.*

**September 11, 2020**

# In the Court of Appeals of Georgia

A20A1544. AEGER v. THE STATE.

MERCIER, Judge.

In connection with the fatal shooting of her boyfriend, Phil Davis, Margaret Aeger was indicted for malice murder, felony murder, and aggravated assault. A jury found Aeger guilty of voluntary manslaughter as a lesser included offense of malice murder, and not guilty of the remaining charges. She appeals the conviction, contending that the evidence was insufficient to support the verdict and that the trial court gave an improper jury instruction. For the reasons that follow, we affirm.

1. Aeger contends that the evidence was insufficient to support a voluntary manslaughter conviction because the testimony showed that she acted in self-defense. The evidence was sufficient.

In reviewing the sufficiency of the evidence to support a conviction,

we view the evidence in the light most favorable to the jury's verdict and determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Conflicts in the testimony of the witnesses . . . are a matter of credibility for the jury to resolve.

*Muckle v. State*, 307 Ga. App. 634 (705 SE2d 721) (2011) (citation and punctuation omitted).

So viewed, the evidence shows the following. Aeger testified that on the evening of December 22, 2013, she returned home from work to find Davis, her live-in boyfriend of nine years, drinking alcohol. At the time, Davis was 74 years old and Aeger was about 51 years old. At Davis's suggestion, Aeger had sold her own home to move in with him.

Aeger testified that upon returning home, she and Davis drank whiskey and talked, then Aeger took a hydrocodone pill for back pain and went to bed. Davis stayed up. Aeger testified that shortly after she fell asleep, she was awakened by Davis striking her on her face with his hand and yelling at her to "get out." Aeger told Davis that she would leave if he let her get up. Instead of letting Aeger get up, Davis held the right side of her head and yanked her around in the bed. She broke free, got up, and put on her housecoat. Davis then just stood there, glaring at her. Aeger moved

2

toward the bedroom door and Davis stepped across the threshold. Aeger then closed and locked the bedroom door, with her inside and Davis outside the bedroom. Aeger testified that Davis was turning the doorknob, beating on the door and screaming, "bitch open this f------ door!" Aeger grabbed a gun from the nightstand and told Davis that she had his gun and that he needed to "go lay down and sober up." Davis continued beating on the door. Aeger fired a shot into the left doorframe and, when Davis kept trying to get through the door, she fired a shot "forward" into the door. Aeger then "heard a thump and heard [Davis] say, oh."

Aeger testified that she fired the gun through the door because "he was coming through there . . . to get me." Asked if she believed that Davis would come "through the door" had she not fired the gun, Aeger replied: "Yes. Because I had experienced that, not with him but in past history[.]" She said Davis had hit and kicked her before, though she had not shown anyone any injuries, had not sustained any serious injuries, and had not contacted police. Aeger testified that she worked in a state prison (from 2009 through 2014) and was trained in firearm use, including in taking defensive stances when shooting, and agreed that she "easily could have shot him if he busted through that door." She admitted that she "had all the weapons in [the] bedroom with" her. Aeger also had a phone with her in the bedroom and, after the shooting, phoned

3

her daughter. Her daughter told her to call 911, which she did. Aeger admitted at trial that when officers arrived she did not tell them that she had feared for her life before firing the gun, though she testified at trial that during the incident she was afraid that Davis was going to either "paralyze . . . or kill" her. Aeger testified that she and Davis had not been arguing before Davis entered the bedroom. Asked if Davis had asked her to move out of the house, Aeger testified that he had previously told her that if she did not like him putting her dog outside, she "[could] get out too."

A sergeant with the Vidalia Police Department testified that he and two other officers went to the residence on the morning of December 23, 2013, in response to a "shots being fired" report. They shined flashlights through a french door and saw a person lying on the floor. The officers "asked for the door to be opened" but when their request was refused, they kicked open the door. They entered and found Davis lying on the floor outside the bedroom door, motionless. He appeared to be deceased. The bedroom door appeared to be sturdy, with no defects other than the bullet holes. Aeger was inside the bedroom.

The sergeant testified that he entered the bedroom and saw Aeger, who appeared to be intoxicated. She did not have any visible marks on her, and nothing in the bedroom indicated there had been a struggle. Objects on the night stand were

4

undisturbed. Aeger spontaneously told the sergeant that "she was not going to be hit by another man anymore, that she would kill the m----- f-----, eventually." She told the sergeant that Davis had pulled clumps of hair from the right side of her head and that the hair was all over the bed. The sergeant looked but did not see any injuries to Aeger, any clumps of hair missing from her head or on the bed, or "any large clumps of hair anywhere in [the] bedroom." He heard Aeger tell emergency medical personnel that the left side of her head was injured. Officers found on the night stand the .38 caliber gun Aeger had used in the shooting. They found no weapons near Davis, and no weapons in the part of the house where Davis was found. Other officers testified that no clumps of hair were found on the bed or in the bedroom. An officer testified that Aeger was walking "fine" at the crime scene and stepped over Davis's body as she walked to an ambulance seeking medical attention.

An agent with the Georgia Bureau of Investigation (GBI) testified that she met with Aeger on the morning of December 23, 2013, to document any injuries she might have. Aeger told the agent where she had been injured, but the agent did not see any bruising, marks or large clumps of hair missing, though she did feel a "soft spot" on Aeger's head. GBI testing revealed that Aeger's blood-alcohol level was

0.124 "a few" hours after the incident, and that Davis's blood-alcohol level was 0.164.[1]

A police investigator with the Vidalia Police Department testified that he checked the Vidalia Police Department's computer records for the previous 20 years and found no domestic violence reports between Aeger and Davis and no incidents in which the police had been called to the residence. A second police investigator also checked police records and found no evidence of any prior disputes involving the residence, Aeger or Davis. A medical examiner with the GBI testified that Davis died as a result of a gunshot wound to his chest.

A close friend of Davis testified that he was with Davis nearly every day, and that Aeger's and Davis's relationship was sometimes volatile. The friend testified that he had witnessed arguments between the two, but never any violence, and that Davis had never discussed violence toward women. He added that Davis had a drinking problem and that his desire to stop drinking was a source of friction between Aeger and Davis because Aeger insisted she could continue to drink in his presence. Months

---

[1] As a reference, see OCGA § 40-6-391 (a) (5) (prohibiting driving a motor vehicle while a person's blood-alcohol concentration is 0.08 grams or more).

before the shooting, Aeger told the friend, "I'm fighting for a place to live here because [Davis] wants me gone."

OCGA § 16-5-2 (a) provides:

> A person commits the offense of voluntary manslaughter when [she] causes the death of another human being under circumstances which would otherwise be murder and if [she] acts solely as the result of a sudden, violent, and irresistible passion resulting from serious provocation sufficient to excite such passion in a reasonable person[.]

Aeger argues that the evidence was insufficient to prove that she was acting as the result of "serious provocation sufficient to excite such passion in a reasonable person," when the evidence showed that she acted in self-defense.[2]

As set out above, there was evidence that Aeger and Davis had a sometimes volatile relationship and had argued before; that Davis had told Aeger she would have to move out and that she was fighting to keep her place in the home; that Davis was 74 years old, was not known to be violent and had no police record for violence or other incidents; that both Aeger and Davis were intoxicated that night, and drinking

---

[2] OCGA § 16-3-21 (a) provides in relevant part: "[A] person is justified in using force which is intended or likely to cause death or great bodily harm only if he or she reasonably believes that such force is necessary to prevent death or great bodily injury to himself or herself[.]"

was a source of their conflict; that Aeger sustained no visible injuries that night (though there was a "soft spot" on her head) and had not been seriously injured by Davis previously; that no clumps of hair were found in the bedroom; that Aeger gave conflicting details of the incident, some of which were not supported by officers' observations at the scene; that Aeger had not previously reported any domestic violence by Davis; that officers saw no evidence of a struggle in the bedroom; that Davis was unarmed at the time of the incident; and that Aeger was trained in firearm use and fired the gun twice through the locked door (including into Davis's chest) when she knew Davis was on the other side of the door.

"Circumstances which are sufficient to show voluntary manslaughter, as opposed to justifiable homicide, include a situation in which sudden passion, or fear, is aroused in the actor, without malice aforethought, and the actor willfully kills his attacker, when it was not necessary for him to do so in order to protect himself." *Thomas v. State*, 296 Ga. App. 231, 233-234 (1) (674 SE2d 96) (2009) (citation and punctuation omitted). "[C]onduct cannot be justified as self-defense if the amount of force used by the person to defend himself or herself is excessive." *Muckle*, supra at 637 (1) (a) (citation omitted). "[W]hether or not the evidence shows that a person had a reasonable belief that it was necessary to use deadly force to prevent death or great

8

bodily injury to [herself] is a question for the jury." *Davis v. State*, 309 Ga. App. 831, 833 (1) (711 SE2d 324) (2011) (citation and punctuation omitted). And "the determination of a witness's credibility, including the defendant's testimony, is within the exclusive province of the jury." *Seals v. State*, 350 Ga. App. 787, 789-790 (1) (830 SE2d 315) (2019) (citations and punctuation omitted); see *Muckle*, supra at 638 (1) (a).

In this case, the jury was authorized to conclude from the evidence that Aeger was not justified in using deadly force to protect herself from Davis, who was intoxicated, unarmed and outside of the locked bedroom. See *Thomas*, supra; *Linzy v. State*, 277 Ga. App. 673, 674 (627 SE2d 411) (2006). Despite any evidentiary conflicts, the jury was free to disbelieve Aeger's claim of self-defense and to find that she "was so influenced and excited that [s]he reacted passionately rather than simply to defend" herself when she shot and killed Davis. *White v. State*, 312 Ga. App. 421, 425 (1) (b) (718 SE2d 335) (2011) (citations and punctuation omitted); see *Davis*, supra at 833 (1).

2. Aeger contends that the trial court erred by instructing the jury that it was required to consider voluntary manslaughter only after acquitting her of malice murder and felony murder. Aeger argues that the instructions were given "in a

confusing, sequential and/or hierarchical manner and thereby impaired the jury's consideration of each offense," and that the instructions were made worse by a "confusing verdict form."[3] Aeger did not object at trial to the instructions or to the form of the verdict. We find no basis for reversal.

Where, as here, defense counsel made no objection to the court's jury instructions, we review the claimed error "only for plain error. To meet the standard for plain error, [Aeger] must show an error: (1) that has not been affirmatively waived; (2) that is clear or obvious; and (3) that affected [her] substantial rights." *Morris v. State*, 303 Ga. 192, 197 (V) (811 SE2d 321) (2018) (citations and punctuation omitted); see *Jones v. State*, 279 Ga. 854, 860 (7) (a) (622 SE2d 1)

---

[3] The amended verdict form provided:

> We, the Jury, find the Defendant, Margaret Marie Aeger,
>
> **As to Count 1 - Malice Murder**: ___ Guilty ___ Not Guilty
> **As to Count 2 - Felony Murder**: ___ Guilty ___ Not Guilty
> If not guilty as to Counts 1 and 2, then you must consider Voluntary Manslaughter: If Guilty as to either Counts 1 or 2 or both, then you do not need to address Voluntary Manslaughter.
> **As to Voluntary Manslaughter**: ___ Guilty ___ Not Guilty
> **As to Count 3 - Aggravated Assault**: ___ Guilty ___ Not Guilty
> [Date]
> [Signature]

(2005) (by failing to raise any objection to the form of the verdict below, appellant waived right to assert error in that regard on appeal). "If these standards of the plain-error test are met, we may exercise our discretion to reverse if the error seriously affects the fairness, integrity or public reputation of judicial proceedings." *Morris*, supra. (citation and punctuation omitted).

Aeger asserts that the verdict form and the court's instructions regarding that form were confusing and improperly implied the order in which the jury was to consider the murder and manslaughter charges. Aeger argues that the instructions, "particularly those within the verdict form," improperly instructed the jury that it must consider a conviction for malice murder or felony murder before considering a conviction for voluntary manslaughter.

Along with the verdict form, Aeger references the following instruction the court gave while responding to the first note the jury sent during deliberations:[4]

> [T]o clarify and to make sure that there was no confusion regarding the charges on the malice murder, felony murder and voluntary manslaughter, just wanted to clear up and submit to you the verdict form. The charge in the law that was given to you was correct.

---

[4] The jury's note does not appear to be in the record, but it purportedly requested certain evidence and equipment.

11

But to make sure that you understand the verdict form, I'm going to send an amended form with you[.] . . .It addresses malice murder, felony murder and then voluntary manslaughter. Keep in mind that if you find the [D]efendant not guilty as to malice murder and to felony murder, then you must consider the voluntary manslaughter charge. If it's guilty as to either the malice murder or the felony murder, then you need not address the manslaughter charge. If you find manslaughter based on the law that I gave – excuse me, if you find the Defendant not guilty or if you find that the State has not proven beyond a reasonable doubt that the Defendant committed the offense of malice murder and felony murder, then you would address the voluntary manslaughter. In the form it gives you the instructions here in this verdict form.

Also, toward the end of its initial jury charge, the trial court sought to clarify its instructions by adding that the jury was to only consider voluntary manslaughter if it found Aeger not guilty of malice murder and felony murder.

"A trial court may instruct a jury to consider a greater offense before it considers a lesser offense. A trial court may not, however, instruct the jury that it must reach a unanimous verdict on the greater offense before considering the lesser offense." *Morris*, supra at 198 (citations and punctuation omitted); see *Seals*, supra at 794-795 (2) (b). "[A] sequential charge requiring the jury to consider voluntary manslaughter *only* if it has considered and found the defendant not guilty of malice

12

murder and felony murder is not appropriate where there is evidence that would authorize a charge on voluntary manslaughter.'"*Morris*, supra at 197, quoting *Edge v. State*, 261 Ga. 865, 867 (414 SE2d 463) (1992) (punctuation omitted).

Notably, the trial court did not specifically instruct the jury that it must reach a *unanimous* verdict on the murder charges before considering the voluntary manslaughter offense; so there was no clear error in that regard. But, even if some portion of the instruction was improper, the standard for plain error has not been met in this case.

As our Courts have explained, "[t]here is no exact formula that trial courts must follow in this context so long as the charge as a whole ensures that the jury will consider whether evidence of provocation and passion might authorize a verdict of voluntary manslaughter."*Morris*, supra (citation and punctuation omitted). Here, the court's jury charge as a whole ensured that the jury would consider whether the evidence might authorize a verdict of voluntary manslaughter. Specifically, the court included instructions defining murder and directed the jury: "After consideration of all the evidence*, before you will be authorized to return a verdict of guilty of malice murder, you must first determine whether mitigating circumstances if any would cause the offense to reduce to voluntary manslaughter*." (Emphasis supplied.) The

13

court then gave the statutory definition of voluntary manslaughter. See OCGA § 16-5-2 (a). Next, after defining felony murder and aggravated assault, the court reiterated:

> After the consideration of all of the evidence, before you would be authorized to determine the verdict of malice murder or felony murder, *you must first determine whether mitigating circumstances, if any, would cause the offense to be reduced to voluntary manslaughter*.

(Emphasis supplied.) The court again defined voluntary manslaughter, adding that the State had the burden of proving beyond a reasonable doubt that the offense of murder was not so mitigated, explaining the principles of provocation and passion in the context of voluntary manslaughter. And, in response to a second note from the jury,[5] the court repeated the instructions it had given twice earlier in which it directed the jury to first determine whether the circumstances of the case would cause the offense to be reduced to voluntary manslaughter. Further, the verdict form provided that the jury could find Aeger guilty of malice murder, felony murder *or* voluntary manslaughter. See *Johnson v. State*, 300 Ga. 665, 669 (4) (b) (797 SE2d 903) (2017). We note that "[t]he intent of *Edge* was to prevent trial courts from authorizing juries

---

[5] In the second note, which is also not in the record, the jury apparently asked to be recharged on the crimes of malice murder, felony murder, voluntary manslaughter and aggravated assault.

14

to find defendants guilty of felony murder without consideration of evidence of provocation or passion which might authorize a verdict of voluntary manslaughter." *Hayes v. State*, 279 Ga. 642, 644 (2) (619 SE2d 628) (2005) (citation and punctuation omitted).

In sum, the court instructed the jury several times that before it would be authorized to determine the verdict of murder, it must first determine whether mitigating circumstances would cause the offense of murder to be reduced to voluntary manslaughter and, each time, the court included in its definition of voluntary manslaughter the appropriate passion and provocation language. The court also instructed the jury that the State had the burden of proving that the killing was done without mitigating circumstances. Thus, per the court's instructions, the jury could not find Aeger guilty of murder without considering evidence of provocation or passion which might authorize a verdict of

voluntary manslaughter.

> As a whole, the instruction in this case did not prevent the jury from fully considering voluntary manslaughter, and was adequate to inform the jury that before they could convict of malice or felony murder, they must first consider whether there was sufficient evidence of passion or provocation to support a conviction for voluntary manslaughter.

15

*Elvie v. State*, 289 Ga. 779, 781 (2) (716 SE2d 170) (2011) (citation and punctuation omitted); see *Morris*, supra; *Stanley v. State*, 300 Ga. 587, 590 (2) (797 SE2d 98) (2017) (plain error not shown based on alleged sequential instruction where "nothing in the trial court's instruction prohibited the jury from considering whether there was evidence of provocation or passion to support returning a verdict of guilty on a charge of voluntary manslaughter"). The instruction at issue did not likely affect the outcome of the proceedings and did not seriously affect the fairness, integrity or public reputation of judicial proceedings. See *Stanley*, supra at 591 (2). Accordingly, we find no plain error. See id.; *Seals*, supra at 795 (2) (b); *Dent v. State*, 303 Ga. 110, 114 (3) (810 SE2d 527) (2018) (a jury charge constitutes plain error only when the instruction has an obvious defect which likely affected the outcome of the proceedings); see generally *Armstrong v. State*, 277 Ga. 122, 123 (2) (587 SE2d 5) (2003) (no reversible error where neither the trial court's instruction nor the verdict form required the jury to reach a *unanimous* verdict on the greater offense before considering the lesser-included offense).

*Judgment affirmed. Miller, P. J., and Pipkin, J., concur*.